**PHILIP J. DINHOFER, LLC**
ATTORNEYS AT LAW
77 N. CENTRE AVE. - SUITE 314
ROCKVILLE CENTRE, NY 11570
TEL: 516-678-3500
FAX: 516-678-4235
E-MAIL: PJDLLC2806@YAHOO.COM

December 6, 2022

**VIA ECF**

Hon. Gabriel W. Gorenstein          **MEMORANDUM ENDORSED**
United States Magistrate Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:    Ball v. Metro North Commuter Railroad
       21 Civ. 6159 (LGS)(GWG)

Dear Judge Gorenstein:

      Plaintiff and defendant have a strong disagreement as to the scope of defendant's liability in this action, hence this has limited defendant's discovery responses to plaintiff's demands, such that plaintiff believes the Court's intervention and resolution of these issues is required at this time to the extent that defendant be directed to provide such other and further discovery as is warranted by these circumstances. A copy of plaintiff's demands along with defendant's responses is attached hereto as Exhibit 1.

      The instant action arises under the aegis of the FELA, 45 USC § 51, et. seq. (Hereinafter the "FELA"). The Court's familiarity with the FELA and its liberal remedial application within the various Courts of the United States is presumed. The plaintiff, Charles Ball, was at all relevant times a third-rail electrician employed by the defendant Metro North Commuter Railroad (hereinafter "MNR"). He had held this position for some 11 years prior to the date of his injury, and in fact, at one time he was promoted to the position of a third-rail crew foreman for MNR. Charles Ball was subsequently relieved from his foreman's position based on trumped up disciplinary charges by MNR when he refused orders to perform work that he knew was dangerous and unsafe for his crew to do in the manner and under circumstances in which he was then directed to do the job by his MNR superiors. This was the beginning of a never-ending history of enmity as between Charles Ball and his workplace superiors at MNR. Mr. Ball became a chronic whistle blower as to his foremen and other workplace superiors, complaining both in house and to various regulatory administrative agencies (FRA, OSHA, Dept. Of Labor) as to their resort to a variety of dangerous and unsafe workplace practices. He, and others, also chronically complained about the racially hostile workplace environment that was generated by his fellow MNR employees to MNR's in house EEO, diversity management and legal departments. When those complaints drew no meaningful response he also complained to MNR's President, Catherine Rinaldi, and then to the US EEOC. Mr. Ball also complained internally to his superiors at MNR and to his Union causing them to file grievances with MNR regarding being habitually passed over on the seniority roster when it came time to award overtime work assignments. On one particular occasion, Mr. Ball was almost punched when physically threatened by a junior employee who grew violent when surprised and caught by Mr. Ball in the locker room after having just worked an overtime job that was never offered to Charles Ball first as it should properly have been.

On February 24, 2020 and while working at Grand Central Station, NY on a third-rail renovation program ongoing thereat, the plaintiff suffered a severe disabling electrical shock injury when he "accidentally" came into contact with the live current used to energize the third-rail at Grand Central Station.  This occurred when while working on a third-rail renovation project at GCT, he picked up a heavy duty electrical lead cable that unbeknownst to him carried live third-rail current.  Plaintiff had been specially assigned by his foreman, Peter Famularo, to re-attach the cable to the newly replaced third-rail.  The foreman had taken plaintiff away from doing other work that he had already been assigned to earlier during that work shift and had actually started, allegedly because he was the most proficient man at shaping the heads of the leads to securely fit onto the thimbles that connected the lead cable to the third-rail.  This was the fourth such connection that plaintiff was making under his foreman's closely supervised watchful eye that day.  Plaintiff was under the impression that the lead was de-energized, as were all the other leads he came into contact with during that day while working within the third-rail renovation project's specified work zone.  It is plaintiff's understanding of railroad rules, policy and/or procedure 1) that live current should never be introduced into a protected work zone and, 2) that in the rare instance where live current is brought into the work zone an unattached lead should bear a warning tag that would be prominently placed in a highly visible position on top of the lead, so that it could be plainly seen and that no one accidentally picked it up and was electrically shocked, especially without first requesting that the cable be de-energized.  Charles Ball asserts that when he looked, he saw no tag on that particular cable.  However, when he knelt down to pick it up, he was immediately shocked.  He only managed to survive this near catastrophic experience because by some miracle, he managed to let go of the cable.

Plaintiff, immediately stopped doing what he was doing, looked over his shoulder and reported the incident to his Foreman, Peter Famularo, who was standing right over him at the time.  Mr. Famularo then went over to the cable and simultaneously came up with two tags in his hands that he asserts were attached to it.  Charles Ball only saw the tags in Mr. Famularo's hands.  Charles Ball asserts that if attached as alleged by Mr. Famularo, the tags were wrongfully buried on the underside of the cable so as to be hidden from his sight.  Mr. Famularo asserts that the tags were visibly on top of the cable, as does a second third-railman, Stephen Jost, who claims he was standing nearby and that he personally saw the tags on top of the cable.  Mr. Jost further claims that he saw Mr. Ball ignore the tags as he attempted to pick up the cable.

By no strange coincidence, Mr. Jost, is the junior employee who attempted to engage plaintiff in a fist fight during the aforementioned overtime matter as was reported by plaintiff at PLTF616 (Exhibit 3).  We believe plaintiff also made claims against Mr. Jost for creating a racially hostile work environment.  Equally fortuitous, Foreman Famularo is one of the individuals against whom plaintiff and others made numerous complaints against for having chronically created a racially hostile work environment, engaged in unsafe work practices and cheating him out of overtime (See generally Exhibits 2, 3 & 4).  Post-incident, MNR conducted a pre-determined internal disciplinary hearing in its own self-controlled kangaroo court forum where the railroad via its various subordinate employees were charging officer, prosecutor, hearing officer, sentencing officer and appellate officer.  Based in large part upon the supposed eyewitness testimony of Mr. Jost and Foreman Famularo, the railroad ignored the contrary claims/evidence of Charles Ball and instead determined that the electrocution incident was his own fault, for which they terminated his employment and cut off plaintiff's medical benefits, thereby limiting his ability to obtain full, complete, necessary and/or proper treatment for the injuries he suffered when electrocuted.

On account of the foregoing events and proceeding, defendant has committed itself to its defense of this lawsuit.  They are taking a blame the victim defense as stated by Pete Famularo and Stephen Jost, not only for wrongfully picking up an allegedly tagged live cable, but also for wrongfully working outside the safety of the protected de-energized work zone.  Plaintiff, on the other hand, contends the cable was not properly tagged to visibly indicate that it bore live current, something that is prohibited within the protected work zone where he was working.  On the superficial level, this presents a material triable issue of fact as to defendant's negligence and liability herein in accordance with the law of the FELA which obliges the railroad with a non-delegable duty to provide plaintiff with a safe workplace, that is viewed in the negligence to the slightest degree standard of the FELA.  Rogers v. Missouri Pacific Railroad Co., 352 US 500, 506, 77 SCt 443, 1 LEd2d 493 (1957).  Thus we are compelled to point out that the Second Circuit has unquestionably interpreted Rogers as giving rise to a "relaxed standard for negligence as well as causation." [See e.g.:  Williams v. Long Island R.R. Co., 196 F3d 402, 406 (2nd Cir.  1999) ("However, it is also true that a relaxed standard of negligence applies in FELA cases in this Circuit.").  See also,  Ulfik v. Metro–North Commuter R.R., 77 F3d 54, at n. 1 (2nd Cir.1996) ("numerous appellate courts, including ours, have construed the statute, in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation.") and, Coale v. Metro-North Commuter R. Co., 621 Fed.Appx. 13, 14 (2nd Cir. 2015) ("Courts apply a more relaxed standard of both negligence and causation to FELA negligence claims than to those arising under common law.")

On a much deeper and more troubling level and as an alternate theory of this case that we intend on proving at trial, plaintiff believes that these facts also present the disturbing triable issue of fact under the FELA as to whether or not Mr. Jost, Mr. Famularo and perhaps other MNR personnel participated in a deliberate scheme to silence, seriously injure, disable and/or kill Charles Ball, so as to be forever rid of a "troublemaker", who was their chronic whistle blower, accuser and antagonist to all of them.  See e.g.: PLTF605 (Exhibit 3) where some 18 months prior to and foreshadowing the subject incident, plaintiff reported and complained about overhearing a conversation between Pete Famularo and Stephen Jost, amongst others, wherein they agreed to conspire and retaliate against Charles Ball with acts of physical violence, but yet again the railroad did nothing about this matter.

Although the text of the FELA statute speaks only of negligence, FELA has nevertheless been interpreted to cover intentional torts. See Atchison T. & S.F.R. Co. v. Buell, 480 U.S. 557, 562 n.8, 94 L. Ed. 2d 563, 107 S. Ct. 1410 (1987)(Citing, Jamison v. Encarnacion, 281 U.S. 635, 641 (1930); Lancaster v. Norfolk & Western R. Co., 773 F.2d 807, 812-813 (CA7 1985), cert. pending, No. 85-1702; Slaughter v. Atlantic Coast Line R. Co., 112 U. S. App. D. C. 327, 302 F.2d 912, cert denied, 371 U.S. 827 (1962); see generally Annot., Liability Under Federal Employers' Liability Act for Intentional Tort, 8 ALR 3d 442 (1966).).  See also, Buell, Supra, at 480 US 570, n.21.

 In a FELA case in which the plaintiff's injuries have been intentionally inflicted by a co-employee, a plaintiff may recover under either of two theories: (1) that the employer is directly negligent for failing to prevent the foreseeable assault; or (2) that the assault was perpetrated within the fellow employee's scope of employment and in furtherance of the employer's business. Sowards v. Chesapeake & Ohio Ry. Co., 580 F.2d 713, 715 (4th Cir. 1978).  As stated by the Court of Appeals in Lancaster v. Norfolk & Western Ry. Co., 773 F.2d 807, 818 (7th Cir. 1985), cert. denied, 480 U.S. 945, 94 L.Ed.2d 788, 107 S.Ct. 1602 (1987):

> We conclude -- and it is as far as we need go to decide this case -- that an FELA plaintiff may prevail in an intentional tort case by showing either that the intentional tort was committed in furtherance of the employer's objectives or that the employer was negligent in hiring, supervising, or failing to fire the employee.
>
> Under the second branch of liability, the principle that limits the employer's liability to torts committed in furtherance of his business drops out. <u>Brooks v. Washington Terminal Co.</u>, supra, 593 F.2d at 1288; <u>Slaughter v. Atlantic Coast Line R.R.</u>, supra, 302 F.2d at 916 n.7

Plaintiff intends to prove at the trial to be had herein both that the assault perpetrated against him was in furtherance of MNR's business and also that it was the product of MNR's neglect in supervising and failing to discipline or fire its derelict employees in violation of the FELA. In the first instance, in cannot be seriously disputed that when injured, Charles Ball was performing the work tasks he had been assigned to do, shaping the leads and re-attaching them to the newly installed third-rail. Clearly then, by following his foreman's directive as to what job he was doing, Charles Ball was acting in furtherance of his employer's business when injured. Secondly, plaintiff intends to prove a case of direct negligence against MNR under the FELA for its do nothing approach to the multitude of workplace safety, discrimination, general harassment and overtime complaints made by plaintiff and others against the various co-employees and supervisory personnel had within its third-rail department. It is plaintiff's claim that these complaints were so numerous and pervasive, that had MNR been attentive and acted as any reasonable employer would have by giving these complaints some semblance of a meaningful response, they would have imposed significant discipline against the bad actions of these railroad employees, and/or terminated their employment, such that 1) they would never have perpetuated the later acts against which plaintiff was complaining; 2) plaintiff's complaints would have stopped; and, 3) at least Pete Famularo and Stephen Jost would never have been retained in the railroad's employ nor left in a position to have set-up and caused plaintiff to suffer the electrocution injuries that he did. Instead, the evidence herein will show the railroad did nothing meaningful, if anything at all, as to the many complaints received from plaintiff and others.[1] They looked the other way and tolerated these deplorable work conditions and circumstances, excused egregiously flagrant racism, and wrongfully tolerated the misconduct of its run amok employees in the third-rail department, hence they are liable under the FELA.

With all the foregoing in mind, plaintiff crafted an extensive discovery document request seeking some 181 items (admittedly approximately 12 items inadvertently repeated) that are

---

[1] See e.g.: Exhibit 2, Bates PLTF738, a MNR document referencing outrageous racist language from Mr. Famularo, which MNR excuses and forgives without any meaningful redress as they assert he was just repeating what he heard on TV the night before, as if that excuses things and makes it all right for him to create a racially hostile workplace. Alternatively see Exhibit 2, commencing at Bates PLTF693, regarding Supervisor Richard Ranallo, whose inexcusable black face appearance at a company party MNR knew about, had photographic evidence of but which they sat on, kept secret and took no action for 5 years until after promoting him to a supervisory role it became widely disclosed in the media by the public outcry of outraged employees, leaving MNR with no other alternative than to impose discipline once caught in the public eye. These exhibits are the kind of evidence that show a good faith basis demonstrating an institutional policy by MNR of acceptance, tolerance and/or condonation of a racially hostile work environment contrary to the law. It also shows that some railroad employees believed they were permissibly entitled by MNR to do what they wanted and get away with it - even to seriously injure and or kill another employee whom they disliked. Lastly, it justifies the type and kind of discovery sought by plaintiff.

predicated upon the facts and circumstances of the happening hereof as well as the many random, disassociated pages and fragments of documents that have survived in plaintiff's possession over the past approximate 10 years regarding some, but by no means all, of his various workplace complaints.  These documents are annexed hereto as Exhibit 2 (Plaintiff's Bates Nos.  693 - 743); Exhibit 3 (Plaintiff's Bates Nos. 590-692) and Exhibit 4 (Plaintiff's Bates Nos. 706-743), all were provided to defendant as a part of our Rule 26 automatic disclosure.  They show the many and varied complaints made by plaintiff and the various MNR personnel within their diversity management, EEO, departmental, legal and presidential offices within whom he was in contact with.  Plaintiff seeks the defendant MNR's complete records, files, etc., had in conjunction with these multiple reported incidents and all others.  Plaintiff also seeks all records related to the over all work project on which he was working at the time of the occurrence, its planning, the staging, sequencing of various work assignments, and it's defined protected areas. (Mr. Ball maintains that he was suspiciously and prematurely taken from his assigned job to prematurely take care of the leads that day, when his understanding of the project was that they should have been addressed at the end of the project on a later date.)  Plaintiff also seeks documents regarding claims made at other railroad employee disciplinary matters of which he was aware arose under similar circumstances, to contrast  the inconsistent claims MNR made at his own disciplinary hearing regarding live current in a protected work zone.  Plaintiff seeks MNR internal EEO, diversity, labor relations, safety department complaints, charges, claims, findings and remedial corrective actions taken with regard to these matters brought on by plaintiff and other MNR employees.  In sum, plaintiff seeks the records and information that challenge the character, credibility and bias of Mr. Jost and Mr. Famularo, showing the predicate for their retaliatory motivation to lie, set up, stage and cause his injuries, as well as that which shows MNR's chronic whitewash of the various complaints they heard that rendered the heinous actions of both these railroad employees all the more foreseeable.

      Given all the foregoing, it is not surprising that defendant wrongfully objects to providing any of this discovery based on meaningless boilerplate claims of over-breadth and relevance.  At times they object feigning an inability to understand what plaintiff seeks, such as what is meant by the "work area", notwithstanding that they inconsistently assert that plaintiff was not within the "work area" when injured.  At other times they object to a single or group of descriptive words in a demand and use that as a predicate for not responding to multiple other descriptive words they clearly comprehend and do not object to.  Defendant objects to providing plaintiff with their complete files regarding matters in which he was the complainant, no less that which would inform him of their findings, or remedial corrective actions in resolution thereof.  Defendant even attempts to evade producing the original warning tags that were on the cable for plaintiff's viewing and inspection, instead claiming that it should suffice that plaintiff was provided with a photograph of them, and notwithstanding that we have the absolute right to see the actual physical item of evidence.  Moreover, defendant refuses to provide any information regarding the very specific work orders that were written upon the face of the photo of the tags, so that we could better understand the very work orders by which these tags ostensibly came to be in existence.  Additionally significantly important, defendant objects to about 100 of the 181 stated discovery demands based on vague unspecified claims of attorney client and work product privilege, yet at no time do they ever provide any kind of privileges log as required by Local Civil Rule 26.2 of the Southern District.  How then is plaintiff supposed to evaluate the merits of the claim or the Court's need for an *in camera* inspection of these allegedly privileged materials?

Hon. Gabriel W. Gorenstein  Page 6
December 6, 2022

      With my most sincere apologies and in view of the aforementioned evidence, it is clear that the reasons for plaintiff's many demands are too numerous to recount and argue item by item within the limited context of a letter such as this one. Plaintiff's demands are not some frivolous fishing expedition but rather well grounded in the abundant documentary evidence we have so far supplied. For this reason plaintiff is constrained to request a conference wherein the Court and the parties go through all of these demands/responses so that plaintiff may obtain the Court's ruling as to each individual item necessary for the successful prosecution of this lawsuit. Moreover, in view of the foregoing, I am constrained to request that the Court permit the parties to postpone and defer depositions and the forthcoming mediation until sometime after these discovery matters are resolved. Indeed, plaintiff would be most prejudiced were he compelled to proceed to deposition and/or mediation without the benefit of these sought after materials for purposes of preparation of his own testimony, preparation for the taking of testimony of others and for presentation at mediation in support of our liability claims.

      Lastly, the Court should know that on November 25, 2022 and well prior to the filing of this letter, a draft of it was sent to the defense counsel in the spirit of the parties good faith effort to discuss these matters with a view towards their amicable resolution without resort to judicial intervention. Unfortunately, however, it became apparent earlier today that the divide between the various positions of Counsel are such, that the filing of this letter and the Court's intervention are now necessary.

Respectfully yours,

*Philip J. Dinhofer*

PHILIP J. DINHOFER
PJD/dd
Encs:
cc:    Beck Fineman, Esq.

The discovery application is denied for failure to comply with paragraph 2.A of the Court's Individual Practices. That being said, the mediation should not take place until both sides are satisfied they have the documents they need for the mediation to be fruitful.

So Ordered.

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge
December 7, 2022